IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MDL CAPITAL MANAGEMENT, INC., ET AL.,

           Plaintiffs,                        05cv1396

     v.                              (Consolidated with 06cv0389)

                                      **Electronically Filed**

FEDERAL INSURANCE COMPANY,

           Defendants.

## <u>Memorandum Opinion</u>

## I.  Introduction

This is a breach of contract and declaratory judgment action.  Plaintiffs, MDL Capital

Management, Inc., ("MDL"), Mark Lay ("Lay"), Steven Sanders ("Sanders"), and Edward

Adatepe ("Adatepe") (collectively referred to as "MDL"), who sought and obtained commercial

insurance coverage (through a "Binder") with Federal Insurance Company ("Federal"), seek

damages and a declaration that Federal should defend and indemnify at least $ 5 million for

claims asserted against plaintiffs in federal court litigation in Ohio for their alleged wrongdoing

regarding investments they made on behalf of their client, the Ohio State Bureau Workers'

Compensation Bureau ("the Bureau").

This Court previously resolved summary judgment in favor of defendant and against

plaintiffs on the parties prior cross-motions for summary judgment, finding that the policy did

not provide insurance coverage based upon certain exclusions in the Errors and Omissions ("E &

O") Coverage Forms and the Directors and Officers ("D & O") Coverage Forms.  Plaintiffs,

thereafter, appealed the judgment of this Court denying coverage for liability claims under the

two separate policy binders.  On April 2, 2008, the United States Court of Appeals for the Third

Circuit affirmed this Court's holding that plaintiffs were not entitled to D & O coverage, but found that this Court erred in giving effect to an exclusion contained in the E & O policy, and thus affirmed in part, reversed in part and remanded for further proceedings. (See Doc. No. 160). In the Per Curiam Opinion, while the United States Court of Appeals reversed this Court's decision on the E & O policy, it noted that the reversal was, "without prejudice to other contentions of the parties with respect to the E & O binder, including allegations of misstatements in the application for insurance." (Doc. No. 161). Upon remand, and following a status conference before this Court after hearing the positions of the parties, the Court issued a renewed briefing schedule for further motions for summary judgment. (Doc. Nos. 163-167).[1]

Currently pending before this Court are the parties cross-motions for summary judgment (doc. nos. 173, 179). Plaintiffs again seek summary judgment as to liability arguing that the E & O policy provides coverage as a matter of law. Defendant also moves for summary judgment and contends that: (1) the application warranty exclusion in the application on which Federal relied bars coverage for all plaintiffs; (2) the criminal conviction of MDL's Chief Executive Officer, Mark D. Lay, for investment adviser, mail and wire fraud stemming from his dealings with the Bureau and trades in the ADF conclusively establishes the applicability of the application warranty exclusion; (3) Federal properly rescinded the conditional binder based on undisputed misrepresentations in the application process; (4) the dishonesty exclusion in the conditional policy bars coverage for MDL and Mr. Lay based on Mr. Lay's conviction; and (5) the personal

_____

[1]According to the docket entries at doc. no. 163-167, while Federal sought further summary judgment briefing, MDL did not wish to pursue further briefing, but instead asked this Court to set a pretrial schedule. The Court determined, after consultation with the parties, that further summary judgment motions were appropriate.

profit exclusion in the Binder bars coverage for MDL and Mr. Lay based on Mr. Lay's conviction.

After careful consideration, and for the reasons that follow, this Court will grant defendant's motion for summary judgment (doc. no. 173), and will deny plaintiffs' motion for summary judgment (doc. no. 179).

## II.  Background Facts

In the parties' cross-motions for summary judgment, they amass over 100 pages of facts. The undisputed material facts may be fairly summarized as follows.

### A.        MDL's Establishment and Management of the ADF

In May, 1998, MDL entered into an agreement with the Bureau whereby MDL agreed to perform professional investment advisory services for and on behalf of the Bureau.  From 1998 to 2005, MDL provided professional investment advisory services to the Bureau in connection with a long bond account.  *See* Joint Statement of Facts Not in Dispute and Responses Concerning Plaintiffs' Motion for Summary Judgment on E & O Coverage (doc. no. 189) at  ¶17.  Sometime between 2002 and 2003, MDL formed the MDL the ADF, and the Bureau was the sole investor in the ADF.  In May 2002, Mr. Lay incorporated the ADF in Bermuda as an investment vehicle through which United States investors and non-United States investors could invest in a portfolio consisting primarily of government, corporate and mortgage-backed fixed income securities.  In the years 2003 and 2004, the Bureau invested $225 million in the ADF. *See* Joint Statement of Facts Not in Dispute and Responses Concerning Federal Insurance Company's Motion for Summary Judgment (doc. no. 183) at  ¶ 19-20; *See also*, *Id*. at  ¶¶ 17-19.

## The Terms of the Private Placement Memorandum

A Private Placement Memorandum ("PPM") governed the management of and investment in the ADF. The PPM permitted leveraging in certain circumstances such as "short selling of securities, reverse repurchase agreements, certain options on future transactions . . . plus borrowings." The PPM specifically stated, that "up to 150% of the Fund's assets (other than U.S. Treasury Securities), at the time of investment may be leveraged (i.e. the combined value of borrowings and short positions) . . . . The percentage referenced above is intended as a 'guideline' and may be changed from time to time at the sole discretion of the Board of Directors." *See* Joint Statement of Material Facts Not in Dispute and Responses Concerning Federal Insurance Company's Motion for Summary Judgment (doc. no. 183) at ¶ 21.

According to the testimony of Bureau official, Terrence Gasper, during the criminal trial of Mr. Lay, in a conversation he allegedly had with Mr. Lay, it was envisioned that the Fund would typically be leveraged at 100%, but Mr. Lay outlined a 150% "limit" to give the Fund some flexibility.[2] *Id.* at ¶ 22.

---

[2]Plaintiffs have continually objected to the use of any trial excerpts from the criminal trial of Mr. Lay (at responses to paragraph numbers 22-39, 57-66), arguing primarily that these documents constitute inadmissible hearsay and that the criminal trial of Mr. Lay "is not at issue in this lawsuit." For purposes of this summary judgment motion, the Court will accept the uncontradicted testimony of witnesses at the parallel criminal trial of Mr. Lay, while subject to the cross examination and the penalties of perjury. The trial testimony of these witnesses has as great, if not a greater, indicia of reliability than deposition testimony, which is commonly used as evidence to support summary judgment motions. The Court can see no rational reason undisputed sworn testimony before a judge and jury in a parallel criminal action would not constitute appropriate supporting documentation under Fed. R. Civ. P. 56, as it is at least, if not more reliable than affidavits, which are commonly attached as supporting or opposing documentation in a Rule 56 motion. Hearsay evidence contained in affidavits and deposition testimony may be sufficient to survive a summary judgment motion unless such evidence clearly would not be admissible at trial *See Clark v. Commonwealth of Pennsylvania*, 885 F.Supp. 694, 709 n.3 (E.D. Pa. 1995), citing *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,, 998 F.2d

### The Bureau Officials and MDL Officers Express Concerns About Management of the Fund

In late 2003 and early 2004, concerns were voiced to Mr. Lay, who primarily managed the ADF, about the declines in the ADF's net asset value and MDL's use of leveraging activities. MDL's Chief Investment Officer Ed Adatepe described a number of discussions which he had with Mr. Lay about the ADF's use of leveraging as "heated" and "aggressive." Mr. Adatepe testified that he "went in and said, Mark, please, for the love of God, tell me you are sure, absolutely positive that this Fund is allowed to be over 150 percent?" Plaintiffs do not dispute that Mr. Adatepe so testified; rather, they argue that the language of the PPM allowed changes above 150% and that the number was meant only as a "guideline." *Id*. at ¶ 23.

Defendant alleges that on April 23, 2004, James McLean (the Bureau's Chief Financial Officer) and Mr. Lay met to discuss the Fund's loss of $7.5 million in March 2004. Defendant further alleges that from April through July 2004, James McLean repeatedly asked MDL for reports that provided greater detail about the activity in the ADF "in light of his concerns about the lack of transparency." *Id.* at ¶25. Plaintiffs, however, dispute the contention that there was a lack of transparency, and cite the deposition testimony of Mr. Lay to support its contention that MDL was in constant communication with the Bureau about the activities of the ADF and that there was "complete transparency with the [Bureau]". *Id.* at ¶¶ 24-25.

### Mr. Lay Attempts to Obtain an Amendment to the PPM

According to the ADF Board of Director Meeting Minutes from May 18, 2004, the

---

1224 (3d Cir. 1993), cert. denied sub nom 510 U.S. 994 (1993)("While this statement as it now stands is hearsay, in this circuit it can be considered on a motion for summary judgment because it is capable of being admissible at trial.").

accuracy of which plaintiffs do not dispute, the ADF Board of Directors called a meeting (at which Mark Lay, Ed Adatepe and Steven Sanders were present) "primarily as a result of concerns with the decline in the Fund's net asset value in the months of March and April." The Board questioned Mr. Lay about his use of leverage in the Fund. Mr. Lay did acknowledge that "it was possible that the 150% leverage *limitation* might have been exceeded on an intra-day trade basis." *Id.* at ¶ 26-27 (emphasis added). Plaintiffs do not dispute the existence or accuracy of the meeting minutes, rather they repeatedly cite the PPM itself and state that the leverage provision in the PPM was simply a guideline and not a limitation which could not be exceeded.

Nonetheless, while Mr. Lay assured the Board that the Bureau was well aware of the leveraging practices, the Board still insisted that Mr. Lay obtain an amendment to the PPM, and so, on August 11, 2004, the ADF submitted a proposed revised PPM and cover letter to the Bureau containing "clarifications" to ADF's leveraging practices. Plaintiffs also do not seriously dispute the contents of this letter or the revised PPM, they simply continue to cite the original PPM to support their contention that it gave the ADF the right to change the leverage percentage. *Id.* at ¶ 29.

The proposed revised PPM altered the language of the original leverage limitation to state that "the maximum amount of leverage the Fund intends to employ with regard to assets other than U.S. Treasury Securities will be up to 150% of the Fund's assets, excluding its U.S. Treasury Securities holdings) . . . . In the case of U.S. Treasury Securities, the amount of leverage utilized by the Fund can, and will, be significantly higher in most cases." *Id.* at ¶ ¶ 29-30. The cover letter concluded by seeking the Bureau's concurrence with the revised PPM. *Id.*

Mr. McLean testified in the criminal trial that he considered the revised PPM as "an admission of guilt" because it conceded that for U.S. treasury securities "leveraging has been and will continue to be significantly higher than 150%." *Id*. at ¶ 31.

The Bureau, however, refused to sign the proposed revised PPM. MDL's president, Steven Sanders testified that the situation with the ADF "started to go south"in the third and fourth quarters of 2004. Mr. Sanders questioned Mr. Lay about the Fund's losses, and in response, "Mark . . . asked me, [']Look, you know Steve, I need your support on this . . . . [Can you pray with me [?'] I'd pray, he'd trade, he'd call me back, we'd pray some more, he'd trade, and you know, he'd tell me that I was there to encourage him." *Id*. at ¶ 34

**Bureau Officials Again Confront Mr. Lay About the Fund's Staggering Losses**

According to defendant, on September 16, 2004, Messrs. Gaper and McLean of the Bureau confronted Mr. Lay about the Fund's poor performance, which by this time had lost nearly three quarters of its value. During the meeting, Mr. Lay revealed that the Fund was leveraged an estimated 1,000% rather than 150%, and that the Fund had a short position in 30-year U.S. treasuries of $1.7 billion. Plaintiffs counter, not by denying these facts and statistics, but instead by offering the standard reverence to the original P.M., stating that MDL had no knowledge of any future claims by the Fund, and they cite the deposition testimony of Mr. Lay who stated that there was "complete transparency" with the Bureau. Plaintiffs further argue that the Bureau's continued investment of $164 million through June or July of 2005 "clearly supports the fact that MDL Capital had no reason to believe that the Bureau was intending to assert a claim against MDL Capital." *Id.* at ¶ 35.

According to defendant, the Bureau officials (Messrs. Gaper and McLean) testified that they were "quite agitated" and expressed their extreme reservations about the Fund's leveraging practices in a meeting with Mr. Lay. Mr. McLean testified that the fact the Fund was being managed now with a $1.7 billion short position when the limitation should have been $100 million, was "just incredible, beyond, beyond the imagination, a leverage that [he] referee] to as obscene." *Id*. at 36. Mr. McLean further testified that Mr. Lay responded to the effect of "Well, I guess I'm in trouble now." *Id.* at ¶ 36. Plaintiffs dispute these contentions, and restate Mr. Lay's deposition testimony that he was in constant communication with the Fund and the Bureau was informed of every trade at weekly meetings, that on several occasions, the Bureau invested additional money (up to millions of dollars) to cover the leverage positions, and that there was "complete transparency." *Id*. at ¶ 36.

In the week after the meeting between the Bureau officials and Mr. Lay, Mr. Lay requested an emergency infusion of $25 million to answer a margin call and to avoid a potential loss of $200 million. Mr. Gaper testified that he agreed to have the Bureau supply the money because he felt he had no other choice. *Id.* at ¶ 37.

**The Bureau Requests Redemption of Its Investment in the Fund**

On September 29, 2004, MDL informed the Bureau that it needed an additional investment of $30 million to cover a margin call. On the day the Bureau refused to provide the money, the Bureau learned from the Fund's top broker, Credit Suisse First Boston, that the ADF was massively over-leveraged, in the amount of $3.72 billion in the 30-year U.S. treasury long bond alone. The Bureau then formally requested redemption of its investment in the Fund. The Fund, however, was so heavily leveraged that the Bureau gave MDL 90 days to unwind the Fund

because selling $3.7 billion of U.S. treasuries in a short amount of time would have been a "shock to the market" and would have created an "imbalance in the treasury market." *Id.* at 39.

### The Board of MDL Calls a Meeting to Address the Problems with the Fund

On October 27, 2004, the Board conducted a meeting which was described as "intense." The meeting was attended by plaintiffs Mark Lay, Steven Sanders and Ed Adatepe. According to the meeting minutes, the Board expressed alarm about the utilization of leverage and questioned MDL's "highly unusual" trading practices. *Id*. at ¶ 40. During this meeting, the minutes stated that Ms. Murray-Brown:

> [explained that in the view of the corporate directors there seemed to be some confusion on [MDL's] part regarding the difference between the Fund's permitted strategy and the overall strategy of [the Bureau] and that [of MDL]. Ms. Murray-Brown suggested that in light of the information provided at [the Board] meeting perhaps it would have been more prudent for the Fund's Offering Memorandum to have been more reflective of the actual practices of [MDL] and [the] sole shareholder. . . . She further advised that the Warwick and Hamilton directors were concerned about the following: (I) whether [MDL] is trading outside of the Fund mandated parameters as outline in its [P.M.] and (ii) the fact that there is no guarantee that the sole shareholder will continue to supply the capital required to cover losses or collateral requirements. **A discussion ensued regarding the potential liability of the Fund, the Investment Manager [MDL] and the directors [which included Messrs. Lay, Sanders and Adatepe.]**

*Id*. at ¶ 41 (emphasis added).

It bears repeating that the meeting minutes of October 27, 2004 specifically state that the Board discussed potential liability of the Fund, and plaintiffs do not dispute the accuracy of the meeting minutes.

### The Bureau Refuses to Provide Any Further Investments in the Fund and Announces an Audit of the Fund

In the October 2004 ADF board meeting, Mr. Lay acknowledged that he needed

approximately $50 million additional capital to cover future margin calls. *Id.* at ¶ 42. On the same day, Mr. Lay met with Messrs. McLean, John Annarino (the Bureau's Chief Legal Counsel), Jerry Jackson (the Bureau's media liaison) and two lawyers from the law firm Schottenstein, Zox and Dunn, as well as Ken Brunk, a consultant. *Id.* at ¶ 43. During the meeting and in writing thereafter, Mr. Lay requested that the Bureau provide half of the amount necessary to cover future margin calls. Mr. Annarino responded by stating, "I will tell you what, I am not giving you the money." *Id.* at ¶ 44.

In October 2004, the Bureau and its auditors went to MDL's offices to review MDL's trade records. *Id.* at 45. According to plaintiffs, Mr. Adatepe spent about 10 minutes with the representative from the Bureau and the auditor and Mr. Lay told Mr. Adatepe the day after the meeting that "everything was fine." *Id.* at ¶ 45.

Having already lost more than $215 million, the Bureau refused to invest any new funds in the ADF after November 2004. The Bureau then hired outside counsel to investigate its investment in the ADF and by letter sent on November 1, 2004, lawyers for the Bureau demanded a broad range of information regarding the investment in the ADF, including any evidence that the Bureau ever agreed to leverage in excess of 150% in its account. Mr. Lay, however, testified that the contact from outside counsel and the audit was not a concern to him and that because MDL managed other products for the Bureau, "[t]here was no reason for [MDL Capital] to - for me or anyone else to read anything into that." *Id.* at ¶¶ 46-47.

By letter dated December 28, 2004, the Bureau confirmed a telephone call with Mr. Lay and others that it would be hiring an accounting firm to audit the ADF's records and the letter reserved "all rights and remedies available to it under the Fund documents and at law." *Id.* at ¶¶

48-49.

**B.     The Federal Policy Binder**

During the period from May 2003 to May 2005, American International Specialty Lines

Insurance Company (AISLIC) provided Investment Advisers E & O coverage and D & O

insurance coverage to MDL with a combined limit of liability of $10 million.[3]  MDL, worked

through a broker, Seubert & Associates, to obtain a renewal of coverage.  According to plaintiffs,

Seubert also used the renewal application process to shop for coverage from other insurance

companies because the costs of the premiums with AISLIC were too high.  While MDL

completed an application for renewal of its insurance with AISLIC, Seubert also used the

AISLIC Application to market the MDL account to other insurance carries, including Federal.

*Id.* at ¶ 3.  Federal agreed to use the AISLIC Application, among other information, to issue a

quote.  *Id.* at ¶ 4.

On March 24, 2005, Federal received the AISLIC Application which was signed by Mr.

Lay, as CEO and Chairman of the Board of MDL.  Id. at ¶ 6.  The AISLIC Application asked the

following warranty question:

> Does the applicant or any of its partners, directors, officers, employees or
> trustees have any knowledge of any fact or circumstance which might give
> rise to a claim under the proposed policy?
>
> Yes ___          No ___

MDL replied by marking "X" next to "No."  *Id.* at ¶ 7.

---

[3]AISLIC was originally a named defendant in this action.  However, because plaintiffs
and AISLIC were able to reach a settlement, the parties filed a stipulation of dismissal on January
23, 2006, which this Court approved.  (Doc. No. 42 and text order of 1/24/06). Accordingly,
Federal is the only remaining defendant.

On May 5, 2005, based on and in reliance on the AISLIC Application and attachments and other written and oral representations made in the application process, Federal issued a quote for D & O, E & O, and Employment Practices Liability Insurance coverage. *Id*. at ¶ 8.

On May 10, 2005, Richard Smithbauer and Brian Long of Seubert met with representatives of MDL, including Mimi Beal and Naja Foushee, to discuss the quotes received from Federal and AISLIC. *Id*. at ¶ 9. During the meeting, Mr. Smithbauer advised the MDL representatives that if they were considering accepting for the Federal quote, "they need[ed] to be certain that there are no potential claims out there, any issues regarding disgruntled clients, [or] anything that might give rise to a claim," and "to make sure that there are no potential or pending claims or any employees [that] have knowledge of any situations that could give rise to a claim." *Id*. at ¶ 10. Mr. Smithbauer reaffirmed the need to poll employees about potential claims in a brief meeting with Mr. Lay when he and Mr. Long were leaving MDL's offices after the meeting. *Id* at. ¶ 11. According to MDL, it conducted such an investigation and Ms. Beal definitively testified that these issues were discussed at senior management meetings with nothing reported and nothing was reported to her by MDL employees regarding any potential claims. *Id*. at ¶¶ 10,12.

On May 17, 2005, MDL sent Federal an order to bind coverage in accordance with the terms and conditions of the Federal Quote. *Id*. at ¶ 13. On May 18, 2005, Federal issued the Binder, which Federal refers to as the "Conditional Binder," for the period of May 19, 2005 to June 19, 2005. *Id*. at ¶ 14. The Binder stated that "the coverage provided by this Binder is subject to all of the terms and conditions of the quotation letter of 5/5/2005." *Id*. at ¶ 14.

The E & O and D & O liability coverages under the Binder had an aggregate policy limit

of $5 million. The Binder specified that the policy period was for the one-year period from May 19, 2005 to May 19, 2006, although the term of the Binder was for a one-month period from May 19, 2005 to June 19, 2005.  MDL paid the premium for the entire policy period in the amount of $91,885.  *See* Joint Statement of Facts Not in Dispute and Responses Concerning Plaintiffs' Motion for Summary Judgment on E & O Coverage (doc. no. 189) at  ¶¶ 1-3.

The Binder also included several contingencies, including receipt by Federal of signed Federal applications and the FY 2004 Financials as well as the audited financial statements for FY 2004 "when it becomes available," and the most recent SEC examinations and management's responses thereto.  *See* Joint Statement of Material Facts Not in Dispute and Responses Concerning Federal Insurance Company's Motion for Summary Judgment (doc. no. 183) at  ¶ 15. Plaintiffs allege that Federal admitted that it received all of the "subjectivities" except for the 2004 CPA Audit before June 19, 2005, because it was not available as of that date.  Federal asserts that it never received the FY 2004 Financials; but plaintiffs dispute that contention and allege that MDL provided draft 2004 Financials to Federal on April 6, 2006.

### C.    The E & O Policy Form Language

The Binder referenced a Federal Policy Form for the E & O coverage.  The form contained the following language:

> [F]ederal shall pay on behalf of the Insured all Loss for which the Insured shall become legally obligated to pay as a result of any Claim first made against the Insureds after the Original Policy Date as noted in ITEM 8 [sic] of the Declarations arising out of any Wrongful Act committed by the Insured during or prior to the Policy Period in the performance of Professional Services.

*See* Joint Statement of Facts Not in Dispute and Responses Concerning Plaintiffs' Motion for

Summary Judgment on E & O Coverage (doc. no. 185) at ¶ 6.

Federal's Investment Adviser E & O Policy Form referenced in the Binder defined "Insureds" to mean "the Parent Organization, Insured Organization and/or Insured Persons." *Id*. at ¶ 6). The Binder identified MDL as the Parent Organization and the Insured Organization. *Id*. at ¶ 7.

The Investment Adviser E & O Policy Form referenced in the Binder defined "Loss" to mean, in pertinent part, "the total amount which the Insured becomes legally obligated to pay on account of each Claim and for all Claims made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs, and Defense costs." *Id*. at ¶ 8.

The Investment Adviser E & O Policy Form referenced in the Binder defined "Claim" to mean, in pertinent part, "(I) a civil proceeding commenced by the service of a complaint or similar pleading; (ii) any investigation into possible violations of law or regulation initiated by any governmental body or self regulatory organization (SRO), or any proceeding commenced by the filing of a notice of charges, or formal investigative order or similar document; or (iii) a written Demand, against an Insured for a Wrongful Act. . . ." *Id*. at ¶ 10.

The Investment Adviser E & O policy form referenced in the Binder defined "Policy Period" to mean, in pertinent part, "the period of time specified in ITEM 4 of the Declaration, subject to prior termination in accordance with Section 21. . . ." *Id*. at ¶ 12. While plaintiffs allege that ITEM 4 specified the time period to mean May 19, 2005 to May 19, 2006, defendant contends that ITEM 4 was blank and that the policy period would have been May 19, 2005 to May 19, 2006, "had that policy been issued and if it were valid." *Id*. at ¶ 13.

The Investment Adviser E & O Policy Form referenced in the Binder defined "Wrongful Act" to mean "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured while performing or failing to perform Professional Services." *Id*. at ¶ 14.

Additionally, the Investment Adviser E & O Policy Form referenced in the Binder defined "Professional Services," to mean services "performed or required to be performed by an Insured solely in its capacity as an Investment Adviser for or on behalf of a customer of the Insured pursuant to an agreement between such customer and the Insured for a fee, commission, or other monetary consideration or other remuneration which inures to the benefit of the Insured." *Id*. at ¶ 15.

The Investment Adviser E & O Policy Form referenced in the Binder defined "Investment Advisor" as "any person acting as investment advisor as defined in Section 202(11) of the Investment Advisers Act of 1940, as amended." *Id*. at ¶ 16.

**D.      The Bureau Files Suit Against MDL**

On June 10, 2005, the Bureau brought suit against MDL, Lay, Adatepe, Sanders, the ADF and the ADF's other directors, and the case was subsequently removed to the United States District Court for the Southern District of Ohio. *Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, Ltd.,* no. 2:05-cv-00673 (S.D. Ohio). *See* doc. no. 183 at ¶ 50.

The multiple count complaint brought by the Bureau alleges mismanagement of and enormous losses in the ADF, and asserted, *inter alia*, claims for negligent misrepresentation, breach of fiduciary duty and breach of contract. *See* doc. no. 185 at ¶ 22. MDL provided Federal with notice of the ADF litigation on June 14, 2005.

15

By letter of July 26, 2005, subject to the receipt of additional information about what MDL knew at the time of the application process, Federal reserved its right to deny coverage based on the Application Warranty Exclusion (quoted hereinabove), and to rescind the Binder and "Contemplated" Policies. *See* doc. no. 183 at ¶ 52. The civil suit brought by the Bureau against MDL recently settled for $5 million.

### E.    The SEC Investigation Commences

On July 15, 2005, after the filing of the civil complaint by the Bureau, the Securities Exchange Commission (SEC) commenced a non-public investigation related to the litigation pending in Ohio. On July 29, 2005, MDL gave notice of the SEC Investigation to Federal. *Id*. at ¶ 54.

In a August 23, 2005 letter from Federal to plaintiffs, Federal advised that it was investigating "whether representations, warranties and other information submitted by MDL Capital to Federal" during the underwriting process "were true and complete." Accordingly, Federal reserved the right to deny coverage for the SEC investigation based on the exclusions in the applications submitted, including the AISLIC Application, and to rescind the "Conditional" Binder and the "Contemplated" Policies. *Id.* at ¶ 55.

### F.    A Jury Convicts Mr. Lay of Committing Fraud

On June 14, 2007, a grand jury empaneled in the United States District Court for the Northern District of Ohio returned a four-count indictment against Mr. Lay, and on September 7, 2007, the grand jury returned a superseding indictment alleging that Mr. Lay committed: (1) investment adviser fraud by engaging in a "course of business which was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in the ADF, in violation of the

P.M., and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%"; (2) conspiracy to commit or attempt mail and wire fraud by, among other things, engaging in a conspiracy to defraud the Bureau by concealing "the true nature and effect of the use of leverage in excess of 150%"; and (3) two counts of mail fraud by using the mails to defraud the Bureau. *Id.* at ¶ 56.

The criminal jury trial of Mr. Lay commenced on October 12, 2007, and ended on October 30, 2007. In order for the jury to find Mr. Lay guilty of count one (investment adviser fraud), it had to find that Mr. Lay acted "knowingly, willfully and with the intent to defraud, deceive or manipulate," the Bureau. *Id.* at ¶ 59. The Court further instructed the jury that "the knowledge requirement would be satisfied," if it found that Mr. Lay "acted with deliberate disregard . . . or with the conscious purpose of avoiding the truth." For the jury to convict Mr. Law of count two (conspiracy to commit mail fraud), the jury had to find that Mr. Lay "willingly, knowingly, and voluntarily" joined the conspiracy to defraud the Bureau. *Id.* at ¶ 62. And, for the jury to convict Mr. Lay of counts three and four (mail fraud), the jury had to find that Mr. Lay "knowingly participated [in a] scheme to defraud," the Bureau. *Id.* at ¶ 63.

On October 30, 2007, the jury returned a verdict of guilty on all four counts. The jury also determined that Mr. Lay wrongfully obtained $590,526.23 from his fraudulent acts. On May 13, 2008, the Court denied Mr. Lay's motion for judgment of acquittal and for a new trial. According to the criminal docket in *United States of America v. Mark D. Lay* (1:07-cr-339), on July 8, 2008, the Honorable David D. Dowd, Jr. of the United States District Court for the Northern District of Ohio, Eastern Division, sentenced Mr. Lay to a period of incarceration of 60 months as to Count 1 and 144 months as to each of Count 2, 3 and 4, to run concurrently; 3 years

of supervised release, restitution in the amount of $212,967,084.76, and forfeiture in the amount of $590,526.23. In addition, the Court authored a lengthy Memorandum Opinion and Order Analyzing the Sentencing Factors Set Forth in 18 U.S.C. Section 3553(a). (*See United States v. Lay*, 1:07-cr-339 at doc. no. 181).

### III. Standard of Review

Summary judgment under Fed.R.Civ.P. 56© is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.) *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party ).

## IV. Discussion

Plaintiffs move for summary judgment arguing that the Binder provides coverage as a matter of law, while defendant Federal advances several arguments in support of its theory that

there is no coverage as a matter of law. Defendant alleges that (1) the application warranty exclusion in the application on which Federal relied bars coverage for all plaintiffs; (2) the criminal conviction of MDL's Chief Executive Officer, Mark D. Lay, for investment adviser, mail and wire fraud stemming from his dealings with the Bureau and trades in the ADF conclusively establishes the applicability of the application warranty exclusion; (3) Federal properly rescinded the Conditional Binder based on undisputed misrepresentations in the application process; (4) the dishonesty exclusion in the Policy bars coverage for MDL and Mr. Lay based on Mr. Lay's conviction; and, (5) the personal profit exclusion in the Binder bars coverage for MDL and Mr. Lay based on Mr. Lay's conviction.

A.     **Applicable Law**

The parties agree that Pennsylvania law governs the interpretation of the Binder. The Supreme Court of Pennsylvania summarized the law of insurance contract interpretation in *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa. 445, 879 A.2d 166 (2005), where it stated as follows:

> [W]e begin our analysis by setting forth the well-established rules of insurance contract interpretation. "The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." *Madison Construction Co. v. Harleysville Mutual Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999) (citations omitted); *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (1986) (*quoting Standard Venetian Blind Co.* (citations omitted)). When the language of the policy is clear and unambiguous, a court is required to give effect to that language. *Id*. When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification

and against the insurer, as the insurer drafts the policy, and controls coverage. *See id.* "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " *Madison Construction Co.*, 735 A.2d at 106 (*quoting Hutchison v. Sunbeam Coal Co.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)). Finally, "[i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982) (*quoting Moore v. Stevens Coal Co.*, 315 Pa. 564, 173 A. 661, 662 (1934)). Thus, we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties.

879 A.2d at 171. *See also J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 363-65 (3d Cir. 2004) (summarizing Pennsylvania law on the interpretation of insurance contracts).

The rule that any ambiguity must be resolved in favor of coverage for the insured recognizes that insurance policies are contracts of adhesion between parties of usually unequal bargaining power, especially regarding the language of such contracts that has been drafted by the insurance industry, *McMillan v. State Mut. Life Assur. Co. of America*, 922 F.2d 1073, 1075 (3d Cir. 1990), and that "transactions between insurers and insureds are fundamentally different from those between parties to contracts as envisioned by the common law." *Bensalem Tp. v. Int'l. Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309-10 (3d Cir. 1994).

The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. *Lower Frederick Tp. v. Clemmer*, 518 Pa. 313, 543 A.2d 502 (1988). In *Bensalem Tp. v. Int'l. Surplus Lines Ins. Co.*, 38 F.3d at 1309, the United States Court of Appeals for the Third Circuit instructed courts applying Pennsylvania law to "examine the totality of the insurance transaction involved to ascertain the reasonable expectation of the insured." However, the reasonable expectations doctrine "is only applied in very limited circumstances to protect

non-commercial insureds from policy terms not readily apparent and from insurer deception."
*Canal Ins. Co. v. Lloyd's London,* 435 F.3d 431, 440 (3d Cir. 2006).

The intention of the parties must be ascertained from the document itself, if its terms are clear and unambiguous. *Hutchison, supra*. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *State Highway & Bridge Auth. v. E.J. Albrecht Co.*, 59 Pa.Cmwlth. 246, 430 A.2d 328 (1981). A determination of whether a contract is ambiguous also is a question of law for the court. *Hutchison*, *supra*.

"An insurance contract must be construed as a whole, and not in discrete units." *Luko v. Lloyd's London*, 573 A.2d 1139, 1142 (Pa. Super. 1990) (citations omitted). Therefore, the entire Binder, including the endorsements, must be considered in determining what risk the policy covers and what risk it does not cover. *Rorer Group, Inc. v. Ins. Co. of N. Am.*, 655 A.2d 123, 125 (Pa. Super. 1995). Finally, coverage exclusions must be clearly expressed in the policy and narrowly construed against the insurer, in favor of coverage. *See Pecorara v. Erie Ins. Exchange*, 596 A.2d 237, 239 (Pa. Super. 1991).

**B.** **The Warranty Exclusion in the Policy Application Unambiguously Bars Coverage**

As noted hereinabove, it is undisputed that on March 24, 2005, Federal received the AISLIC Application which was signed by Mr. Lay, as CEO and Chairman of the Board of MDL. Id. at ¶ 6. The AISLIC Application asked the following warranty question:

> Does the applicant or any of its partners, directors, officers, employees or trustees have any knowledge of any fact or circumstance which might give rise to a claim under the proposed policy?
> Yes ___        No ___

MDL replied by marking "X" next to "No." *Id.* at ¶ 7.

The Application Warranty Question was followed by the statement that, "[i]t is agreed that if such knowledge exists any claim arising from such fact or circumstances will not be covered by the policy." *Id*. at ¶ 7.

The Unites States Court of Appeals for the Third Circuit has held that an Application Warranty Exclusion applies if (1) plaintiffs subjectively had knowledge of the operative facts, and (2) an objective person in plaintiffs' position would recognize that the facts and circumstances "might give rise to liability." *Selko v. Home Ins. Co.*, 139 F.3d 146, 151 (3d Cir. 1998).

In *Selko*, the Court of Appeals for the Third Circuit stated that while the insurer has the burden to "prove that the necessary underlying facts were actually known to the insured," the insured cannot avoid application of the exclusion, "on grounds of ignorance of the law, oversight, psychological difficulties, or other personal reasons." *Id*. at 152. The "subjective/objective" analysis established in *Selko*, has been followed by the Courts of this Circuit. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001); *Abood v. Gulf Group Lloyds*, 2008 WL 2641310 (W.D. Pa. July 1, 2008); *Coregis Ins. Co. V. City of Harrisburg*, 2005 WL 2179734, at *6-8 (M.D. Pa. 2005); *Westport Ins. Corp. v. Mirsky*, 2002 WL 31018554, at *12 (E.D. Pa. 2002), *aff'd* Fed. Appx. 199 (3d Cir. 2003).[4]

The undisputed facts present a laundry list of instances which illustrate that plaintiffs subjectively, as well as objectively, knew of the problems with the ADF which might give rise to

---

[4]Although the above cited cases involve professional liability insurance coverage for legal malpractice claims, the "subjective/objective" analysis regarding the applicability of exclusions is instructive and is directly relevant to the Warranty Exclusion at issue in this case.

a claim well before MDL completed the March 24, 2005 application with AISLIC.

(1)    In Late 2003/Early 2004, Mr. Adatepe expressed his fear to Mr. Lay that the Fund was over-leveraged: "I went in and said, Mark, please for the love of God, tell me you are sure, absolutely positive that this Fund is allowed to be over 150%." *Id*. at ¶ 23.

(2)    April 23, 2004 - Mr. McLean discusses the Fund's March 2004 losses with Mr. Lay and informs him that the Bureau wants to reduce the Fund's volatility. *Id*. at ¶ 24.

(3)    May 18, 2004 - at a Board of Directors meeting, attended by all plaintiffs, the Board discussed whether MDL was complying with the P.M.'s leverage guidelines. The meeting was called "as a result of concerns with the decline in the Fund's net asset value in the months of March and April". Mr. Lay acknowledged that "the 150% leverage limitation might have been exceeded on an intra-day trade basis," and the Board insisted that Mr. Lay obtain an amendment to the P.M. to permit what he was doing. *Id*. at ¶ 28.

(4)    August 11, 2004 - the Fund sent a revised P.M. to the Bureau and admits that it has "significantly" exceeded the leverage guideline and seeks approval for future leveraging significantly in excess of 150%. *Id*. at ¶ 30. The Bureau refuses to agree to the revised P.M.

(5)    September 16, 2004 - MDL requests an additional $ 30 million from the Bureau to cover margin calls; however, after learning that MDL had been shorting $3.7 billion of the United States treasury long bonds, the Bureau refuses to give the

additional funds and gives MDL 90 days to close the fund.

(6)     October 27, 2004 - in a meeting attended by all plaintiffs, the Board of Directors expressed concerns about "highly unusual" activities in the management of the Fund, the Board quizzed Mr. Lay about the leveraging practices of MDL and, according to the meeting minutes, "a discussion ensued regarding the potential liability of the Fund." *Id*. at ¶¶ 40-41.[5]

(7)     October 2004 - Mr. Lay meets with Bureau officials and legal counsel for the Bureau and when he requests an additional $25 million, the Bureau denies his request. A Bureau office and auditor then visit MDL to acquire records.

(8)     November 2004 - MDL's investment practices result in a loss of $216 million for the Bureau, representing approximately 96% of its investment. *Id*. at ¶ 46. The Bureau is able to recover only $9 million of its total investment.

(9)     November 2, 2004 - lawyers representing the Bureau in an investigation of its investment demand a broad range of information from MDL. *Id*. at ¶ 47. They demand any evidence that the Bureau agreed to leverage in excess of 150%. Mr. Lay reviews the letter. *Id*.

(10)    December 28, 2004 - the Bureau announces a formal audit of the Fund. *Id*. at ¶ 48. The letter announcing the audit reserves "all rights and remedies available to [the Bureau] under the Fund documents and at law." *Id*. at ¶ 49. Mr. Lay reviewed the letter. *Id*. at ¶ 48.

---

[5]The Court could stop its analysis here because the undisputed meeting minutes of the Board demonstrate that the plaintiffs all had subjective knowledge that a claim could be raised against them in October of 2004, over 5 months prior to the completion of the application.

In the face of at least 10 instances in which any reasonable observer would have knowledge that a claim would be likely, if not, imminent, plaintiffs now plead total ignorance of facts within their subjective and/or objective knowledge. The above facts and circumstances indisputably establish that **all** of the plaintiffs had subjective knowledge that a claim was likely at the time the application was completed by MDL. The shear amount of loss of $216 million alone, which amounted to 96% of the investment and the continual violation of the leveraging amounts set forth in the P.M., would have been sufficient information to put any objective person in plaintiffs' position on notice that a claim might give rise to liability, let alone the myriad facts set forth above.

Perhaps the most compelling evidence of plaintiffs' subjective knowledge of the facts and circumstances giving rise to liability is the fact that at the October 27, 2004 Board meeting, at which ALL plaintiffs were present, the Board quizzed Mr. Lay about the leveraging practices of MDL and according to the meeting minutes "a discussion ensued regarding the potential liability of the Fund." *Id.* at ¶¶ 40-41. This fact alone clearly and indisputably demonstrates that Messrs. Lay, Sanders and Adatepe **all** had subjective knowledge of the Fund's significant losses, its excessive leveraging and its potential liability, **and** that any reasonable person in plaintiffs' position would have recognized that the facts and circumstance might give rise to liability.

To the extent that plaintiffs argue that they subjectively did not believe that Bureau would file suit, they can not avoid the applicability of the Warranty Exclusion simply by refusing to acknowledge the writing on the wall and then claiming ignorance, as they have done here.

Furthermore, the Application Warranty Question did not contain a subjective qualifier. It stated unequivocally that if knowledge exists of "any fact or circumstance which might give rise

to a claim under the proposed policy," then "any claim arising from such fact or circumstance will not be covered by the policy." This Court finds that the facts establish that not only would a reasonable person in plaintiffs' position recognize the very real potential for a claim against MDL; but also, that the facts demonstrate that plaintiffs in fact had subjective knowledge of the potential for liability at the time the AISLIC application was completed, and yet, answered the Warranty question in the negative. After applying the two part subjective/objective test set forth in *Selko*, 139 F.3d at151, the Court finds that the Application Warranty Exclusion unequivocally bars coverage for the ADF litigation and the SEC investigation. *See also*, *Abood,* 2008 WL 2641310, *8.

C.     **Mr. Lay's Criminal Conviction Provides An Independent Basis for Summary Judgment Based Upon the Application Warranty Exclusion**

It is undisputed that Mr. Lay was found guilty of four counts of fraud. Mr. Lay was sentenced on July 8, 2008. Accordingly, Mr. Lay is estopped in this civil proceeding from challenging the facts on which his guilty verdict is based.

Pennsylvania law is clear that a criminal conviction collaterally estops a defendant from denying his acts in a subsequent civil trial. *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996). To the extent plaintiffs argue that a pending appeal prevents this Court from applying the doctrine of collateral estoppel, said argument is without merit because collateral estoppel applies "unless or until that conviction is reversed on appeal." *Id.* at 875.

Collateral estoppel applies if: (1) the issue decided in the prior adjudication was identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the conviction is asserted was a party or in privity with a party to the prior

adjudication; (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action; and (5) the determination of the issue in the criminal proceeding was essential to the judgment. *Id.* at 874.

The superseding indictment charged Mr. Lay with investment adviser fraud by engaging in a "course of business which was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in the ADF, in violation of the P.M., and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%;" conspiracy to commit mail and wire fraud by engaging in a conspiracy to defraud the Bureau by concealing the use of leverage in excess of 150%; and two counts of mail fraud by using the mail to defraud the Bureau. It is important to note that the superseding indictment alleges that this fraudulent conduct occurred prior to the time of Mr. Lay's submission of the AISLIC application. Specifically, the application was dated March 16, 2005, and the superseding indictment, on which the jury convicted him of all counts, alleged that Mr. Lay's criminal conduct occurred between September 2003 and January 2005.

Mr. Lay's conviction of knowingly, willfully and intentionally defrauding, deceiving or manipulating the Bureau on his use of leveraging between September 2003 and January 2005, establishes that Mr. Lay knew or should have known of the likelihood of a claim related to his fraudulent conduct. Accordingly, the conviction on count one of the superseding indictment effectively establishes that Mr. Lay, as the applicant on the AISLIC application, and as CEO of MDL, had "knowledge of any fact or circumstance which might give rise to a claim under the proposed policy," yet he answered this question in the negative. Accordingly, based upon the guilty verdict on all four counts, Mr. Lay is estopped from arguing that the Application Warranty

Exclusion does not apply.

Further, the remaining facts of the collateral estoppel test have been met: (1) the Court entered a judgment of guilty and sentenced Mr. Lay on July 8, 2008; (2) Mr. Lay, as the applicant and CEO, was the defendant in the criminal action; (3) Mr. Lay has had a full and fair opportunity to present his defenses in the criminal trial; (4) the conclusion that Mr. Lay knowingly defrauded the Bureau between September 2003 and January 2005 was essential to the criminal judgment.

While plaintiffs contend that the "identity of issues" element of collateral estoppel is not satisfied because the criminal and civil cases did not involve the exact same legal theories, defendant correctly notes that collateral estoppel does not require that the two actions proceed on identical causes of action. *Witkowski v. Welch*, 173 F.3d 192, 203 (3d Cir. 1999) ("Even if there was not a precise identity of the 'causes of action' asserted, it would be of no legal consequence; there is no such requirements for the application of issue preclusion. Only the issue need be the same.")

Plaintiffs argue a lack of privity, and inability to present defenses, and a lack of knowledge of potential claims. This Court finds these arguments to be without merit because the actual language of the Application Warranty Question inquired about the knowledge of "*any*" director, officer or employee, and the Application Warranty Exclusion provides that any such knowledge eliminates coverage for "any claim arising from such fact or circumstances."[6]

---

[6]Likewise, plaintiffs' citation to *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286 (Pa. 2007) is inapposite. In *Baumhammers*, the Pennsylvania Supreme Court held that an insurer had the duty to defend parents of a man who killed several people in the Pittsburgh area on the basis that their deaths were accidental from the parents' perspective and the incidents were deemed an "occurrence" under the parents' homeowners policy. Not only is the *Baumhammers*

Here, Mr. Lay's criminal trial and conviction established that Mr. Lay clearly had subjective knowledge of the operative facts and circumstances which might give rise to a claim because he "willfully, knowingly and voluntarily," joined the conspiracy to defraud the Bureau from 2003 to 2005, and he was therefore aware at the time of the AISLIC application of his fraudulent conduct.[7] Mr. Lay's subjective knowledge of facts and circumstances that might give rise to a claim defeats coverage for all plaintiffs because the Warranty Exclusion applies if *any* director, officer or employee had knowledge of facts which "might give rise to a claim."

### D. Federal May Rescind the Investment Adviser Coverage Part of the Binder Because the Misrepresentations Made by Mr. Lay, on Behalf of All Insureds, Were Undertaken in Bad Faith and Were Material.

Under Pennsylvania law, in order for an insurance policy to be rescinded and deemed void *ab initio*, the insurer must show by clear and convincing evidence that a prospective insured knowingly or in bad faith made a false representation that is material to the risk being insured. *Justofin v. Metr Life Ins. Co.*, 372 F.3d 517, 522 (3d Cir. 2004).

This Court finds that Federal has met its heightened burden of proving by clear and convincing evidence that the prospective insured, Mr. Lay, knowingly and in bad faith made a false representation during the application process. The Court has recounted at least 10 instances of Mr. Lay's knowledge of facts which directly contradict the representations made to Federal on

---

case factually inapposite, the policy language is also much different than the language of this Warranty Exclusion in a business policy, and the issue at hand is whether any of the plaintiffs had subjective and objective knowledge that a claim might be filed against them, yet chose to answer this question incorrectly during the application process, not whether a homicide is an "accident".

[7]The Court will not again address the second prong of the *Silko* test with regard to all plaintiffs because this Court has already held (in Section I) that abundant facts established objective knowledge of facts which might give rise to the claim.

the AISLIC application. As rehearsed, the ADF board (including Messrs. Lay, Sanders and Adatepe) had expressly discussed the potential for legal liability arising from Mr. Lay leveraging practices and rampant mismanagement of the ADF prior to the completion of the AISLIC application. Mr. Lay has been convicted of fraud for his conduct. To say now that Mr. Lay had no idea that a claim could be raised against him is simply incredible. Rather, the 10 instances listed above, along with Mr. Lay's conviction as well as his statement, "Well, I guess I'm in trouble now," regarding his gross abuse of leveraging, as well as the staggering losses in the Fund, necessitates a finding of bad faith at least on the part of Mr. Lay (who filled out the application on behalf of all insureds).[8]

In *Burkert v. Equitable Life Assur. Soc.*, 287 F.3d 293, 298 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit addressed the issue of whether misrepresentations made during a life insurance application process constitute bad faith thus voiding the policy *ab initio*. The Court of Appeals resolved that question in favor of the insurer in the context of a summary judgment motion. The Court aptly stated that "fraud is presumed from knowledge of the falsity." *Id*. at 298. Although the facts of *Burkert* are not directly analogous to this case, the Court nevertheless finds the holding in *Burkert* to be instructive because it resolves the issue of whether an insurance policy may be rescinded based upon false representations that were made in bad faith and with knowledge of their falsities.

There is no doubt that Mr. Lay, as a prospective insured, made misrepresentations during

---

[8]Although there is arguably an issue of fact regarding whether the other insureds had knowledge of the falsity of Mr. Lay's representations and thus also acted in bad faith, we need not reach that issue because, as discussed below, Mr. Lay's misrepresentations, as the agent for all insureds during the application process, must be imputed to all insureds. *Bird v. Penn Cent. Co.*, 341 F.Supp. 291, 294-95 (E.D. Pa. 1972).

the application process, that he did so in bad faith, and that his conviction estops him from arguing to the contrary. However, the issue remains whether the misrepresentations of Mr. Lay are sufficient to void coverage as to *all* plaintiffs.

In *Bird v. Penn. Cent. Co.*, 341 F.Supp. 291, 294-95 (E.D. Pa. 1972), the Honorable Joseph S. Lord, III, the former Chief Judge of United States District Court for the Eastern District of Pennsylvania held that the individual who completes a professional liability policy application functions as the agent of the other insured persons and is therefore liable for actions taken within his or her agency. Under *Bird*, and other cases involving professional liability policies, any material misrepresentations made by Mr. Lay may be imputed to all insureds. *See Shapiro v. Am. Home Assur. Co.*, 584 F.Supp. 1245, 1253 (D. Mass. 1984); *Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, 1997 WL 906427, at *9 (S.D. N.Y. 1997); *FDIC v. Duffy*, 835 F.Supp. 307, 315 (E.D. La. 1993), *aff'd* 47 F.3d 146 (5th Cir. 1995). *Am. Guar. & Liab. Ins. Co. v. Jaques Admiralty Law Firm*, P.C., 2003 WL 22077774, at *8 (E.D. Mich. 2003). Mr. Lay's false responses and misrepresentation in the Application Warranty Question ban coverage for all putative insureds, as long as defendant can demonstrate that the misrepresentations made by Mr. Lay were material to defendant's decision to issue the Binder.

### E. Mr. Lay's Misrepresentation Was Material to Defendant's Decision to Issue the Binder

In the context of an insurance policy, "a fact is material if it increases the risk, or which, if disclosed, would have been a fair reason for demanding a higher premium." *N.Y. Life Ins. Co. v. Johnson*, 923 F.2d 279, 282 (3d Cir. 1991) (citations omitted). "When knowledge or ignorance of certain information would influence the decision of an insurer in the issuance of a

policy, assessing the nature of the risk, or setting premium rates, that information is deemed material to the risk assumed by the insurer." *Rohm & Hass v. Cont'l Cas. Co.*, 781 A.2d 1172, 1179 (Pa. 2001) (citations omitted).

In this case, Federal underwriter, Holly Scott, filed a declaration stating that Mr. Lay's misrepresentation during the underwriting process was material to her determination to issue a quote. She stated:

> The existence of facts and circumstances that might give rise to a claim is material to my assessment of a risk. Obviously, if such facts and circumstances exist, it presents a heightened risk of a claim. Had I known of the facts and circumstances surrounding MDL's management of the Active Duration Fund (the "ADF"), including MDL's leveraging practices, the concerns expressed by Mark Lay's co-worker, the concerns expressed by the ADF board, the refusal by the Ohio Bureau of Workers Compensation to sign the revised private placement memorandum and the extent of the losses in the ADF, I would not have issued a quote or conditional binder to MDL.

Scott Decl. in Support of Defendant's Motion for Summary Judgment (doc. no. 176) at ¶ 4.

Ms. Scott's declaration states the obvious and is unrefuted. Accordingly, based upon the case law and the undisputed facts of record, the Court finds that the misrepresentation made by Mr. Lay, on behalf of the insureds, was material.

**F.     The Dishonesty and Personal Profits Exclusions in the Binder Bars Coverage for Mr. Lay Based Upon His Conviction.**

Federal advances two further arguments in support of its motion for summary judgment. First, that the E & O Policy contained a Dishonesty Exclusion, and second, that the E & O Policy contained a Personal Profit Exclusion, both of which allegedly bar coverage to Mr. Lay and to MDL.

The Dishonesty Exclusion in the "contemplated" policy stated that "Federal shall not be liable for Loss on account of any Claim. . . . for a dishonest, fraudulent or criminal act, where such act is established in fact. . . ." Further, the Personal Profit Exclusion in the "contemplated" policy stated that "[F]ederal shall not be liable for Loss on account of any Claim. . . . for personal profit, advantage or renumeration gained in fact by any Insured, to which they were not legally entitled."

According to Federal, because Mr. Lay was convicted of fraud and conspiracy and the jury also determined that Mr. Lay wrongfully obtained $590,526,23 through his fraudulent activities, both the Dishonesty and Personal Profit Exclusions preclude coverage as a matter of law. Although the Court agrees with defendant, that the Exclusions apply as to Mr. Lay, the Court notes (as defendant concedes) that these Exclusions also state that "no fact pertaining to or knowledge possessed by any Insured Person shall be imputed to any other Insured Person," Statement of Facts at ¶ 67. Accordingly, although the Court will grant summary judgment on the basis of these exclusions against Mr. Lay, the exclusions do not apply to the other insureds based upon the clear and unambiguous language setting forth that knowledge by one insured may not be imputed to another insured. The Court, therefore, will not grant summary judgment on this basis against all plaintiffs; but rather, only as against Mr. Lay.[9]

---

[9]Although the Dishonesty and Personal Profit Exclusionary language is silent on whether Mr. Lay's knowledge may be imputed to MDL, the Court need not resolve that question because the Court has granted summary judgment on the three other separate grounds against all plaintiffs.

## V.  Conclusion

After careful consideration of the parties' respective motions for summary judgment (doc. nos. 173 and 179) and all supporting documentation, the Court finds that the policy application's Warranty Exclusion bars coverage for the ADF litigation and the SEC investigation; that Mr. Lay's criminal conviction provides another basis for summary judgment based upon the Application Warranty Exclusion; that Mr. Lay's material misrepresentations during the application process entitle Federal to rescind the Investment Adviser Coverage Part of the Binder against all insureds and that the policy was therefore void *ab initio*; and that the Dishonesty and Personal Profit Exclusions bar coverage as to Mr. Lay.

Accordingly, for these reasons, defendant's motion for summary judgment (doc. no. 173) will be GRANTED, and plaintiffs' motion for summary judgment (doc. no. 179) will be DENIED.  An appropriate order follows.

s/Arthur J. Schwab           
Arthur J. Schwab
United States District Judge

July 25, 2008

cc:    All counsel of record